# OREGON RESEARCH INSTITUTE, INC. *v.* DEPARTMENT OF REVENUE

Edward N. Fadeley, Eugene, represented plaintiff.

Ted E. Barbera, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered June 25, 1971.

CARLISLE B. ROBERTS, Judge.

Upon demand of the Director of the Lane County Department of Assessment and Taxation, plaintiff paid personal property taxes for the tax years 1968-1969 and 1969-1970 and then appealed to the Department of Revenue for refund of the taxes paid, plus interest, and penalties charged and paid. Appeals for the two years were consolidated for purposes of trial.

The order of the Department of Revenue, No. VL 70-128 (with corrections added by No. VL 70-128(A), dated April 21, 1970) was based on procedural grounds, relating to timeliness of notice of application for exemption from property tax by the plaintiff and of notice of intent to tax by the Director of Assessment and Taxation, but at the trial before this court, each party conceded that the other had met the statutory requirements and that the issues to be decided were:

1. During the tax years mentioned, did the plaintiff come within the provisions of ORS 307.130 which allow exemption to "incorporated literary, benevolent, charitable and scientific institutions"?

2. If the answer to the first question is affirmative, then does certain personal property which plaintiff had under a lease agreement with an option to purchase come within the terms of ORS 307.130 which

require that the property is "owned or being purchased by" the corporation?

The pertinent parts of ORS 307.130 read:

"Upon compliance with ORS 307.162, the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(1) Except as provided in ORS 748.545, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

1. Is the plaintiff an exempt scientific institution within the purview of ORS 307.130?

Oregon Research Institute filed its articles under the Oregon Nonprofit Corporation Act on June 27, 1960. Amended articles were filed on November 2, 1961. The corporation's purposes are to perform and further basic research in the psychological area by applying for governmental and charitable foundation grants for such research. The institute cooperates with the University of Oregon in providing scientific research opportunities for both students and faculty. Information developed by the institute from its research programs is available to the public on a nondiscriminatory basis. While the corporation has a duration which is perpetual, in the event of dissolution any assets would be transferred to the Oregon Development Fund of the University of Oregon or to the University of Oregon at the option of the university's president. The salaries paid to the officers and members of the staff are reasonable and no profits inure to the benefit of any private stockholder or individual. Testimony was undisputed that plaintiff has carried out its goals and

aims in the area of psychological research. Plaintiff was found to be an exempt corporation for state and federal income tax purposes.

1. The court finds plaintiff qualified as a scientific institution entitled to property tax exemption under ORS 307.130 as to real or personal property "owned or being purchased" by it.

2. Does specific personal property, leased by plaintiff, and personal property leased with an option to purchase, come within the language of ORS 307.130 as "property owned or being purchased by" an exempt scientific institution?

Two separate agreements, in the form of leases, were entered into by plaintiff and American-Federal Lease Corp., one in 1967 and one in 1968. The agreement of October 10, 1968, was not supplemented by an option to purchase. The 1967 agreement transferred possession of a PDP-9 Digital Computer and accessories. A letter of the transferor offered an option to the plaintiff to purchase this equipment. For purposes of this decision, each agreement and the equipment covered by it are treated separately.

Under ORS 307.130, the plaintiff would be entitled to a personal property tax exemption of "property owned or being purchased by" it and used for the purposes of the exempt organization during the tax years 1968-1969 and 1969-1970. If the property was leased and not being purchased, then the plaintiff is liable for the personal property taxes thereon under the terms of the contract. Section 9 of each agreement reads in part:

"* * * Lessee shall pay all charges and taxes (local, state and federal) and license and registra-

tion fees which may now or hereafter be imposed upon the ownership, leasing, rental, sale, purchase, possession or use of the equipment, * * *."

Consideration is first given to the lease executed by the plaintiff on October 10, 1968, covering a memory module and related equipment for a total lease balance of $25,443.77 at the monthly rate of $893.15 for an unspecified period. A line in the printed form agreement reads:

"PURCHASE OPTION REQUESTED: Yes ........
No xxx"

■ No testimony was presented showing a purchase option in any form. It is a well-settled principle that, regardless of the form of the transaction, the "rental" payments will be treated as payments on the purchase price when, by virtue thereof, the taxpayer acquires title to or an equity in the property. *Robinson v. Elliott,* 262 F2d 383, 389 (9th Cir, 1958). However, in this case there was exactly the contrary provision in the lease form agreement:

"The equipment is, and shall at all times remain, the property of the Lessor; and Lessee shall have no right, title or interest therein or thereto except as expressly set forth in this lease."

The lease agreement is a true lease and not a security interest or conditional sale. Consequently, the lessee, under the existing lease (Plaintiff's Exhibit 3), does not have a right or option to acquire the property. *In re Wright Homes, Inc.,* 279 F Supp 598, 600 (MD, NC, 1968); 1 Anderson, *Uniform Commercial Code,* 146 (2d ed, 1970). The words "being purchased by" in ORS 307.130 obviously do not cover personal property being used by an exempt organization under an agreement which constitutes a true lease.

Turning to the 1967 agreement, it is found to utilize a printed lease form identical to that previously discussed. No date was on the agreement, but a letter written by the American-Federal Lease Corp., dated November 3, 1967, granting an option to purchase the equipment covered by the lease, indicated that the lease was executed on the same date. The lease covered a Model PDP-9 Digital Computer and accessories for a total cash price of $108,522.02. The net lease balance was $108,522.02, with a lease for 45 months at $2,919.24 per month. At the end of the lease term, the plaintiff had a renewal option to lease on an annual basis for a total yearly rental of $3,798.27. The letter of November 3, 1967, granted a purchase option at the end of the original lease period for $8,681.76 as follows:

"Regarding a purchase option on the lease which you executed with us dated November 3, 1967, covering one Model PDP-9 Digital Computer, we hereby offer you the following purchase option:

"PURCHASE OPTION: In addition to all other terms contained in said lease referred to above and provided Lessee shall have complied with all such terms and shall have made all rental payments promptly when due, the above named party shall have the option to purchase all personal property described in said lease during a period of twenty (20) days from the final date of the term of said lease for the amount of $8,681.76.

"We appreciate the opportunity to be of service. If there are any areas in which we may further serve you or any questions regarding the services we have available, please feel free to contact us."

On the lease form the reference to a purchase option was negatively marked in the same manner as in the 1968 agreement.

The plaintiff contends that something akin to an

equitable interest should be found by virtue of a lease accompanied by an option to purchase; that the "agreement is a form of security holding back the title to insure payment" (Pl's Reply Memo, p 2, lines 18-20); that the words "being purchased by" in ORS 307.130 anticipate the passage of title; and that the court must look to other statutes in aid of the question of whether the lessor had a form of security interest in the equipment. Plaintiff cites a definition of "sale" in the Uniform Commercial Code, ORS 72.1060. The court agrees that the Code must be used as applicable.

ORS 79.1020 (2) applies to leases intended to create a security interest. It reads:

"ORS 79.1010 to 79.5070 apply to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. ORS 79.1010 to 79.5070 do not apply to statutory liens except as provided in ORS 79.3100."

The most significant section of the Uniform Commercial Code for the purposes of this case is ORS 71.2010 (37), defining "security interest":

"(37) 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer is limited in effect to a reservation of a 'security interest.' * * * Unless a lease * * * is intended as security, reservation of title thereunder is not a 'security interest' * * *. *Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that*

*upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."* (Emphasis supplied.)

The draftsman's comments to this section note that "[t]he last two sentences give guidance on the question of whether reservation of title under a particular lease of personal property is or is not a security interest." (UCC, Art 1, § 201, p 16.) This judge would respectfully observe: "Not enough guidance." No clear rule has evolved from the statute or the cases. As stated in Comments, *Equipment Leasing Under the UCC,* 13 UCLA L Rev, pt 1, 125, 130 (1965-66):

"The definition [of security interest] includes too many variables to provide workable predictability. The initial presumption is sufficiently clear— a lease will *not* be covered by Division Nine [of the UCC] unless it is *intended* as a security interest. Presumably, courts will examine a number of objective factors to ascertain intent: the length of the lease, whether the payments exceed the fair rental value, the total amount of the contract, the nature of the property, and past dealings between the parties. Unfortunately these criteria often involve factors which cannot always be ascertained at the outset of the transaction. For example, a low market value upon expiration of the lease may prompt a lessor to leave the equipment with the lessee, even though at the inception of the transaction the lessor contemplated reselling the equipment." (Footnotes omitted.)

"The existence of an option to purchase is not controlling for 'the inclusion of an option to purchase does not itself make the lease one intended for security.' Conversely, a provision that upon compliance with the 'terms of the lease the lessee

shall become the owner of the property with either no further payment or only a nominal payment' creates a security interest in favor of the lessor." (1 Anderson, Uniform Commercial Code (2d ed, 1970), § 1-201:112, p 145.)

In analyzing the present case, two questions must be answered. First, did the parties *intend* the agreement in its true character to be a conditional sale? (*Sanders v. Commercial Credit Corporation*, 398 F2d 988 (5th Cir, 1968); *In re Wheatland Products Co.*, 237 F Supp 820, 822 (WD Pa, 1964).) Secondly, did the option provide that the plaintiff would "become the owner of the property for no additional consideration or for a *nominal* consideration"? (ORS 71.2010(37).)

On the question of intent, the oral testimony shows that the plaintiff hoped to become the owner of the property. It utilized the lease agreement because it had no capital of its own from which to make a down payment for the expensive equipment and it expected to pay the rentals out of its grants and contractual earnings. The typed inserts in the printed lease form negatived the option-to-purchase provision. Some testimony was given by plaintiff to explain the subsequent letter offering an option to purchase. The letter was sought by plaintiff solely on the basis of hope that future financing would be available. At the trial, Mr. Charles Brooks, Administrative Assistant to the Director of plaintiff corporation, expressed the hope that funds would be available "to complete the purchase" when the lease came to an end in May 1971, but conceded that the board had actually made no determination to exercise the option to purchase. The plaintiff's witnesses all testified that the leased equipment was indispensable to the continuance and main-

tenance of plaintiff's program. No testimony was offered as to the intention of the lessor.

Without considering ORS 71.2010(37)(b) (discussed below), the court finds the answer to the question of the lessor's and lessee's intention to be in doubt. Detailed information of the transactions is insufficient to form firm conclusions. The plaintiff has the burden of proof under ORS 305.427, and has not sustained it on this point. Cf. *Smith v. Superior Equipment Company,* 102 Ariz 320, 428 P2d 998, 1000 (1967), wherein the lessor testified; *In re Transcontinental Industries, Inc.,* 3 UCC Rep Serv 235 (Ref in By, ND Ga, 1965).

■ The issue of whether this lease with an option to purchase constitutes a security interest is aided by a presumption in favor of the security interest if the lessee has the option to purchase at the end of the lease for a nominal amount. *In re Vaillancourt,* 7 UCC Rep Serv 748, 758-759 (Ref in By, D Me, 1970).

The option provided that the lessee would become the owner of property upon an additional payment of $8,681.76, after paying a total under the lease agreement of $131,365.80. One cannot fail to note that the option price is small when compared to the total "rental" payments of $131,365.80, which amounts to 6.6 percent, or, if compared to the $108,522.02 cash price, it amounts to 8 percent. However, one must also remember that the plaintiff had the option to renew the lease for only $3,798.27 per year. The issue turns upon the meaning of "nominal" in ORS 71.2010(37)(b).

As stated in 13 UCLA L Rev, *supra,* at 130:

"The pre-eminence of the option provisions, however, is the primary source of confusion. Sec-

tion 1201(37)(b) [ORS .71.2010(37)(b)] dictates that the inclusion of an option provision which can be exercised for a 'nominal' consideration absolutely qualifies a lease as a security agreement. 'Nominal' is a vague term which allows three possible constructions: (1) an absolute sum; (2) relative to the initial price of the property or; (3) relative to the market value of the equipment at the time the option is exercised." (Footnotes omitted.)

In the present state of the law, each of these three possibilities must be given consideration and related to the facts in this case.

■ "Nominal" as an absolute sum means that it exists in name only, without comparison to what might properly be expected. Black's Law Dictionary 1199 (4th ed, 1957). The term in this sense, as used by some courts, means $1 or some other small amount. *In re Wheatland Electric Products Co.,* supra; *In re South View Country Club of Mankato, Inc.,* 229 F Supp 105, 108 (1963); *Stanley v. Fabricators, Inc.,* 459 P2d 467 (Alas, 1969) [6 UCC Rep Serv 1262]; *Transamerica Leasing Corp. v. Bureau of Revenue,* 80 NM 48, 450 P2d 934, 939 (1969); *In re Vaillancourt, supra;* 1 Anderson, *supra,* at 146; 1 G. Gilmore, *Security Interests in Personal Property,* 75-81, § 3.6, and 337-340, § 11.2 (1965). In this sense, the option price of $8,681.76 cannot be considered nominal.

The test of "nominal" under the second approach has been stated in terms of the option price to be paid at the end of the contract period in relation to the total rental or purchase price already paid. Where this option price has been small in comparison to the total rental, several courts have held that the contract amounts to a conditional sale of the property. *In re*

*Oak Manufacturing, Inc.,* 6 UCC Rep Serv 1273 (Ref in By, SD NY, 1969), used both comparisons for "nominal," *i.e.,* option price to total "rental" and option price to fair market price at the end of the lease term. *Burroughs Adding Machine Co. v. Bogden,* 9 F2d 54 (8th Cir, 1925) (option $47.19, total rental $547.19); *In re Herold Radio & Electronics Corp.,* 218 F Supp 284 (DC NY 1963), *aff'd* 327 F2d 564 (2d Cir, 1964) (option price about 10 percent of total rental of $113,229); *In re Washington Processing Co., Inc.,* 3 UCC Rep Serv 475 (Ref in By, SD Calif, 1966) (option about 10 percent of total rental of $13,972.50. The referee also considered the fair market value of the overpayment at the end of the lease term to be between $7,500 and $10,000 (unclear if $3,000 to $6,000 reconditioning costs needed). *In re Wheatland Electric Products Co., supra,* considered the purchase price of 25 percent at the end of a one-year term as a substantial amount. Here the lessee could purchase the machine for a list price of $8,025 less 75 percent of the rentals, but not to exceed 75 percent of the list price, so the minimum that lessee could purchase the equipment for was $2,006.25, which the court felt was a substantial amount. The court pointed out that this limitation on the amount of rentals which could be applied to the purchase price was different than other leases which allowed 80 percent of all rentals toward the purchase price without reference to a limit. (This was the distinction between the lease in *In re Wheatland, supra,* and *In re Royer's Bakery, Inc.,* 56 Berks Cty LJ 48, 59 Lanc L Rev 7, 1 UCC Rep Serv 342, 346 (ED Pa, 1963).

*Crest Investment Trust, Inc. v. Atlantic Mobile Corp.,* 252 Md 286, 250 A2d 246 (1969), is somewhat unclear as to the fair market value of a trailer at the

end of a 12-month lease term but it indicated the comparison was to the total purchase price for the purpose of determining what constitutes a nominal amount. In the present case, it is evident that the option price is low in terms of the purchase price but, in the court's view, this is not sufficient, after considering the testimony, to find for plaintiff, as noted below.

The third test used by courts to make the determination of a sale or lease is whether the option to purchase at the end of the contractual term is for a substantial or nominal amount in relation to the fair market price of the property at the end of such term. If the purchase price bears a resemblance to the then fair market price of the property, the rental payments are considered to be compensation in fact for the use of the property and the option to purchase is genuine. *Burroughs Corp. v. Barry,* 380 F2d 427, 431 (8th Cir, 1967). See also *In re Greshan,* 311 F Supp 974, 977 (ED Va 1970), where a lease provided that the property leased was to be sold on the open market at the end of the lease period. The court held that this did not amount to an option to the lessee for only a nominal consideration and therefore was a true lease.

However, if the option price is substantially less than the fair market value of the leased property at the expiration of the lease or term, the lease will be construed as a conditional sale. *In re Oak Manufacturing, Inc., supra; In re Crown Cartridge Corp.,* 220 F Supp 914 (SD NY 1962). In the latter case, the lessee had an option to purchase, at the end of the lease term, property which had a fair market value of $24,000 at an option price of $4,505.47. The court stated:

"While standing by itself $4,505.47 might be

considered 'substantial,' such amount in this case should only be characterized as substantial, or nominal, when considered in relation to some other amount.

"While $4,505.47 may be a substantial amount in relation to $1.00 or $10.00, it is not a substantial amount in relation to $24,000. * * * The purchase price is patently out of proportion to the market value of the goods." 220 F Supp 916-917 (1963).

In *In re Universal Medical Services, Inc.*, 8 UCC Rep Serv 614 (Ref in By, ED Pa, 1970), the referee noted that the proper consideration in determining whether an option price is nominal or substantial hinges on whether that price bears a resemblance to the fair market price of the article. In this case, the lease agreement covered highly specialized laboratory equipment used in a biochemical laboratory for the purpose of blood sampling. The option price at the end of the term of each item was about 10 percent of the selling price new of the equipment. Testimony of witnesses convinced the court of the high degree of physical deterioration of the moving parts of the machine and that the fair market value of the equipment would be about 10 percent of the purchase price, which was also the option price of the equipment. The referee held that this was not nominal but substantial and bore a resemblance to the fair market price of the equipment, thus making it a lease and not a lease intended for security.

■ Each of the three approaches gives a different meaning to the word "nominal"; however, both the absolute sum and the amount of the option relative to the fair market value of the property at the time the option is exercised appear to be the more logical approaches to this problem. In short, the view may be

expressed as stated by the court in *In re Metropolitan Offset Printers, Inc.*, 391 F2d 770, 772 (3d Cir, 1968):

> "* * * Absent a transaction giving the possessor some equity in the chattel, there is no possible basis for treating the owner's title as a mere 'security interest' within the meaning of the controlling Section 1-201(37) [ORS 71.2010(37)] of the Uniform Commercial Code * * *."

Many of the cases hold that when the purchase option price relative to the total rent or total purchase price is small in comparison, then it amounts to a conditional sale or a security interest being created. One should note that in these cases a specified percentage of the rental payments goes toward the purchase price if the option is exercised; *e.g.,* 85 percent of rental payments specifically being applied to the purchase price, justifying the conclusion of some equity in the lessee. *United Rental Equipment Co. v. Potts & Callahan Contracting Co.*, 231 Md 552, 191 A2d 570 (1963); 13 UCLA L Rev, *supra,* at 131, note 44; 1 Anderson, *supra,* at 147. This is not within the facts of the present case.

■ The plaintiff failed in this case to present evidence to show the value of the computer equipment at the end of the lease term; therefore, it would be mere speculation for the court to hold that the $8,681.76 would constitute a nominal amount in comparison to the fair market value of the equipment at the end of the lease period. No testimony was given as to the expected life of the equipment or other important factors needed for the court to base its decision. See *In re Atlantic Times, Inc.*, 259 F Supp 820 (ND Ga 1960) [3 UCC Rep Serv 893], *aff'd* 383 F2d 606 (5th Cir, 1967).

The option price of $8,681.76 certainly cannot be

termed "nominal" in relation to a trivial amount. An argument can be made that the option price in this case is a nominal amount when compared to the total "rental" or purchase price. However, to compare an option price at the end of a lease period to the total purchase or rental price of the equipment is not a sound approach. It does not consider the obsolescence factor and the depreciation through use of the equipment over the lease period. The comparison of the option price to the estimated fair market value at the end of the period would be a more logical and proper determination of a "nominal" amount. *In re Crown Cartridge Corp., supra.*

The plaintiff failed to prove to the satisfaction of the court that the lessee was acquiring an equity in the subject property and that the "lease" agreements amounted to a conditional sale by the lessor. The testimony at the trial clearly indicated that at the time of execution and long afterwards it was an unknown factor as to whether the plaintiff would be able to pay the option price at the end of the lease term. A provision in the "lease" expressly reserved title in the lessor and negated any passage of title by compliance with the "rental" payments due under the agreement. For the court to hold that the plaintiff was "purchasing" the subject property would be a decision based upon mere speculation and not the facts established before the court. The parties filed a stipulation containing additional facts on June 24, 1971, just prior to rendition of this decision, which included a financing statement that had been filed by the lessor, and stated that plaintiff had exercised its option to purchase after completion of the term. These facts do not change the court's conclusion as to the interpretation of the two leases. There can be, have been and

are "true" leases of chattels which are not, in any rational sense, security transactions. 1 G. Gilmore, *supra,* at 76. While the financing statement suggests that the lessor intended the lease to be a "security interest" in the chattel, it may just as easily be viewed as a precautionary measure that many businessmen follow when there is any doubt as to the necessity to file a financing statement. A review of the previously cited cases demonstrates that there is good reason to follow such a course of action. One should note that ORS 71.2010(37)(a) contains the affirmative statement that the presence of an option to purchase does not "of itself" make the lease a security lease.

"* * * The determination whether a lease is 'intended for security' is to be made, * * * 'on the facts of each case.' Neither the presence nor the absence of the option to purchase is conclusive, except with respect to the type of option described in clause (b). [ORS 71.2010(37)(b).] * * *
"* * * * *

"If a lease is determined to be a true lease, it is then completely outside the Code; there is no Code provision which applies to the transaction. * * *" (Footnotes omitted.) (1 G. Gilmore, *supra,* at 339.)

■ Both parties refer to the Tax Court case of *First E.U.B. Church v Commission,* 1 OTR 249 (1963), which recites the legislative history of ORS 307.140, providing for the property tax exemption of certain religious organizations. Both this statute and ORS 307.130 (with which we are presently concerned) had a similar history in that originally each statute required that the property be "owned" by the claimant and subsequently each was amended to add the words "or being purchased by" the claimant. The court in that case held that "owned" referred only to legal title, as

against the plaintiff's contention that "owned" was meant to include both legal and equitable title. Referring to the amendment which added the words "or being purchased" (Or L 1959, ch 207), the court stated that the enactment of the amendment was an "eloquent interpretation," concluding (pp 261-262):

"* * * If 'owned' included both legal and equitable titles, then the amendment would have been unnecessary. Since it was amended, the legislature must have deemed equitable ownerships to be excluded prior to the amendment. By expressly adding ownership under contract of purchase instead of all equitable ownerships, the legislature expressed its intent to limit exemption to only this type of equitable ownership. *Expressio unius est exclusio alterius*.

"The legislative reluctance to open the door to exemption of equities generally has been based upon sound, practical reasons, when the administrative scheme and practice of ad valorem assessment is considered.

"Permitting the exemption of equity ownerships would cause a tremendous increase in the volume and complexity of the work incumbent upon the already harassed county assessor. It would require him to analyze often complicated legal documents and relationships and to form opinions upon situations which plague even the finest legal minds. * * *"

Neither of the leases in question amount to an agreement which could be construed as a purchase of property contemplated by the phrase "being purchased by" in ORS 307.130. Therefore, the plaintiff is not entitled to a refund of the taxes paid on the subject leased personal property.